STATE OF NORTH CAROLINA v. PATRICIA SMITH AND HILLARD ELMER SMITH

No. 7717SC35

(Filed 6 July 1977)

1. Criminal Law § 13— right to try person brought within jurisdiction illegally

Even if defendants were improperly or illegally brought to N. C. after being apprehended in Virginia, this would not affect the right of the State of N. C. to try them and imprison them on felony charges.

2. Criminal Law § 66.1— in-court identification of defendants — witness's opportunity for observation

In a prosecution for breaking and entering and larceny, the trial court's finding that a witness's in-court identification was based on his observation of defendants at the crime scene and that he had ample time to observe them was supported by the evidence where it tended to show that the witness was working in his garden across the street from the crime scene; it was daylight on a clear day; the passage of a car back and forth attracted the witness's attention; as the car continued to pass back and forth, the witness had a clear opportunity to observe the driver and passenger; the witness was able to see only the last two digits of the Virginia license plate because a part of the plate was obstructed; the witness heard a noise in the bushes near the house that was broken into; the car in question stopped at that location and a man came out onto the road and told the occupants of the car to hurry back; the car returned and stopped; the witness got into his truck and proceeded to where the car was stopped; two men were putting something in the car; the witness got to within 30 feet of the car; he got a front as well as a side view of the people; the witness pointed out defendants as two of the people he saw on that day; and no one had pointed out either defendant as being suspects in the case.

3. Husband and Wife § 8— crime committed by wife in husband's presence — no presumption in wife's favor

When it is shown that a married woman commits a crime in the presence of her husband, she should no longer be entitled to a presumption in her favor that she was compelled to so act.

4. Husband and Wife § 8— crime committed by wife in husband's presence — presumption in wife's favor inapplicable

The presumption that a wife who commits certain crimes in the presence of her husband does so under his coercion was not applicable in this prosecution for breaking and entering and larceny where there was no request for instructions with respect to the presumption, and the feme defendant testified in her own behalf denying any participation by her or her husband in the planning or accomplishment of the crime.

State v. Smith

APPEAL by defendant and feme defendant from *Walker, Judge*. Judgment entered 20 August 1976 in Superior Court, ROCKINGHAM County. Heard in the Court of Appeals 1 June 1976.

Each defendant was charged with breaking and entering and larceny. They entered pleas of not guilty and were convicted by a jury on all charges. Defendant Patricia Smith was sentenced to imprisonment as a committed youthful offender for a term not to exceed 10 years. Defendant Hillard Elmer Smith was sentenced to two consecutive 10-year sentences.

The State introduced evidence which tended to show as follows: On the afternoon of 12 June 1976, Dr. and Mrs. John Stone left their home in rural Rockingham County and travelled to Baltimore, Maryland. When they left, all the doors were locked and the house was "in perfect condition." A neighbor subsequently advised the Stones that their home had been broken into and vandalized in their absence. They returned to discover that a rock had been thrown through the glass in the back door, thereby enabling the vandal to reach in and unlock the door from the inside. Various household items, including jewelry, silverware, two televisions, a movie projector, and a pistol, were taken. Every drawer in each room had been pulled out and thrown on the floor. The items missing were valued at $5,000.

Leonard Ferguson, who was charged as a co-defendant in the case, testified for the State. He stated that on 8 June 1976, he and defendant Hillard Elmer Smith discussed breaking into the Stoneses' house. Late in the afternoon of 12 June, Ferguson, accompanied by his girlfriend Myoka Davis, met both defendants and discussed the break-in. Defendants informed him that they had called the Stoneses' telephone number several times, driven by the house, and feme defendant had stopped to ring the doorbell to insure that no one was at home. The four rode to a wooded area behind the Stone house in Ferguson's car, a dark green 1971 Ford whose trunk had been smashed. Ferguson and defendant got out of the car so as to approach the house through the wooded area. Feme defendant got into the front seat with Davis, and they were instructed to drive up and down the road every 5 to 10 minutes. Davis and feme defendant "knew where we were going and what the deal was."

Upon reaching the rear of the house, defendant picked up a large rock, threw it through the glass portion of the rear

door, and reached in to unlock the door. The two men went inside and began to search for money. They took the silverware, two televisions, and various other items and left the house. They returned through the woods to the road, where they waited until Davis and feme defendant rode by and stopped. Defendant and Ferguson loaded the stolen goods in the car and left.

Myoka Davis corroborated Ferguson's account of the crime. She further testified that, upon learning of Ferguson's arrest for the break-in, she and feme defendant drove to a bridge and threw the stolen jewelry and silverware into the water below.

Joseph M. Robinson testified that he was well acquainted with both defendants. They visited Robinson's house with another man and woman (whom Robinson could not positively identify as Ferguson and Davis). Defendant informed Robinson that he had "good stuff" for sale, whereupon defendant opened the lid of the trunk and showed Robinson silverware contained therein. Robinson told defendant he was not interested in purchasing the silver, and defendant left.

Jacquelin Boyd testified that on 12 June 1976, she visited her sister who lived near Dr. Stone. That afternoon, she was in the yard and saw an old dark green car with its trunk smashed drive up and down the road in front of her sister's house. Boyd also testified that she knew feme defendant and that the girl riding in the car's passenger side "looked like Patricia Smith."

James R. Taylor testified that he lived across the street from Dr. and Mrs. Stone. On 12 June 1976 while picking vegetables in his garden, Taylor noticed a car passing back and forth on the road behind Stoneses' house. "There were two ladies in the car, and it was dark, real dark green, banged up in the back." After the car had passed a number of times, Taylor "heard a racket down in the woods" coming from "next to Dr. Stone's." He saw a man emerge from the woods, come to the road, call to the ladies in the car and tell them "to hurry right back, that he was ready." Taylor instructed his wife to call the police and drove in his pickup truck closer to the wooded area. There, he ". . . saw four people, and there were two men putting stuff in the trunk of the car. One of them, well he was putting a portable television and a suitcase in there as I came

up to him and he slammed the lid down and jumped in and they took off. . . ."

*Attorney General Edmisten, by Associate Attorney Amos Dawson, for the State.*

*C. Orville Light for defendant appellants.*

MORRIS, Judge.

[1] By their first assignment of error, defendants contend that the court erred in failing to hear evidence and rule on their motion to dismiss for lack of jurisdiction over the person. The basis for this contention is not clear. The motion states that the defendants were placed in custody in Virginia without probable cause ". . . on the assertion by Rockingham County Deputy Sheriff that said Sheriff's Department had outstanding fugitive warrants from the State of Maryland against these defendants." The brief argues that the warrants are irregular in that each warrant was served by officers in Henry County, Virginia, ". . . and defendants were not brought before hearing, which appears on face of each warrant. Defendants' basic contentions then were fraudulently induced to sign waivers of extradition without advice of counsel." The warrants were issued in Rockingham County, on 15 June 1976, served on 15 June 1976 by an officer of the Sheriff's Department of "Hen-Co.", and a preliminary hearing was held on 2 July 1976 before the District Court, where probable cause was found and the defendants bound over to Superior Court. The motion to dismiss was denied on 17 August 1976 prior to taking of the pleas and trial. Regardless of the lack of clarity with respect to defendants' contention, their position cannot be sustained, for even though they might have been ". . . improperly or illegally brought to North Carolina after being apprehended in Virginia, this would not affect the right of the State of North Carolina to try [them] and imprison [them] on the felony charges. . . ." *State v. Green,* 2 N.C. App. 391, 393, 163 S.E. 2d 14, 16 (1968).

[2] Defendants' assignments of error 2, 3, 4, and 6 are based on exceptions to identification testimony. They first contend that, as to witness Taylor, the evidence disclosed that he did not have sufficient opportunity to observe defendants. They also claim that the court erred in finding that Taylor's in-court identification was based on his observation of defendants and

that he had ample time to observe them. The court found that on the afternoon of 12 June 1976, Taylor was working his garden across the street from the Stone home; that it was daylight on a clear day; that the passage of an automobile back and forth attracted his attention; that it passed back and forth six or seven times and he had a clear opportunity to observe the driver and passenger, both of whom were women; that he looked at the car closely and moved closer to the road to get a better view; that he was only able to see the last two digits of the Virginia license plate because a part of the license plate was obstructed; that the car was dark green, dirty, the trunk was smashed in, and it bore a Virginia license tag; that he twice heard a noise in the bushes near the Stone residence; that the green car stopped at that location and a man came out onto the road and told the occupants of the car to hurry back; that the car returned and stopped; that Taylor, by this time, had gotten in his truck and proceeded to where the car was stopped; that two men were putting something in the car; that he got to a point within 30 feet of the car; that he got a front as well as a side view of the people; that he pointed out Patricia Smith and Myoka Davis as the two women in the car and Leonard Ferguson and Elmer Smith as the two men whom he saw on that date; that no one had pointed out either defendant as being suspects in the case.

From these facts, the court found that the witness had ample opportunity to observe defendants; that there was nothing on voir dire to indicate any suggestion by any person to the witness which would color his identification of either; that there was no evidence of any illegal or unauthorized identification procedures; that the in-court identification was of independent origin based solely on the witness's observation of the defendants on 12 June 1976; and that the identification did not result from any out-of-court confrontation or any out-of-court showing of photographs or other means or from any pre-trial identification procedures which were suggestive or conducive in any way to mistaken identification of either defendant. Although given the opportunity to do so, neither defendant testified on voir dire. The facts found were fully supported by the evidence, and the facts found supported the court's conclusions. These assignments of error are overruled.

On cross-examination, the witness Taylor testified that the officers "brought some photographs over there when they

were in school, high school, but I told the Sheriff that I was not going to identify none of them from those pictures, if I saw them that I would know them but not from that many years difference. I was never asked if I was shown any photographs." Defendants then moved to strike the witness's in-court identification of them. We see nothing in this testimony to warrant striking the witness's identification. The court had properly found that the in-court identification was based solely on the witness's observation of defendants on 12 June 1976. The above testimony merely bolsters that finding. The witness testified that he refused to attempt to identify the defendants from the school photographs but would rely on his observation of them. Defendants' assignments of error concerning these photographs are without merit.

Defendants next contend that certain testimony of Jacquelin Boyd should not have been admitted. There is no indication in the record that an objection was lodged to any question nor that a motion was made to strike any answer. This assignment of error presents nothing for review. On cross-examination of this witness, she testified "I went to school with Patricia. I could not swear it was her but I told Mr. Watkins that it looked like a girl that I knew, Patricia Smith. I would not definitely swear but it looked just like her that I saw in the car." This testimony is in parentheses and following the parentheses this appears "Renew Motion to Strike 'overruled' as having no probative effect. Defendants' Exception No. 3." Assuming that proper motion was made in apt time, which is certainly far from clear from the record, the assignment of error is without merit. If this were the only identification evidence, it would be too conjectural to allow the case to go to the jury. However, the evidence of identity from other witnesses was clear and unequivocal. Any error in admission of this testimony was clearly not prejudicial. This assignment of error is overruled.

By her eleventh assignment of error, feme defendant contends that the court erred in denying her motions for nonsuit timely made. Of course, in ruling on a motion to dismiss as of nonsuit, the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. McKinney,* 288 N.C. 113, 215 S.E. 2d 578 (1975). Whether the evidence is direct, circumstantial or both, if there is evidence from which the jury

could find that the offense charged has been committed and that defendant committed it, the motion for judgment as of nonsuit should be overruled. *State v. Lindley,* 286 N.C. 255, 210 S.E. 2d 207 (1974).

Feme defendant maintains, however, that the State's evidence was insufficient to overcome the presumption that she was acting under the dominion of her husband at the time of the alleged crime.

North Carolina has long recognized and applied the common law principle that when a wife commits certain crimes in the presence of her husband, it is presumed, in the absence of evidence to the contrary, that she did so under his coercion. In *State v. Williams,* 65 N.C. 398 (1871), the first case applying the rule in this State, our Supreme Court reversed the conviction of a wife for assault and battery because of the trial judge's failure to instruct the jury as to the presumption. Since *Williams,* the rule has been continuously recognized and applied. *State v. Cauley,* 244 N.C. 701, 94 S.E. 2d 915 (1956); *State v. Seahorn,* 166 N.C. 373, 81 S.E. 687 (1914); *State v. Nowell,* 156 N.C. 648, 72 S.E. 590 (1911); *State v. Robinson,* 15 N.C. App. 362, 190 S.E. 2d 270, *cert. den.,* 281 N.C. 762, 191 S.E. 2d 363 (1972).

Blackstone notes in Volume 4, p. 29, of his Commentaries that the presumption had existed for at least 1000 years prior to his lectures. Thus, it became incorporated into the web of the common law at a time when the rights of women were almost non-existent. The legal existence of the woman was considered suspended and incorporated into that of her husband during the time of the marriage. Husband and wife became as one. 2 Lee, North Carolina Family Law, § 107, p. 3 (1963). More specifically, the personal property of a woman became vested in her husband upon marriage. He had the right of possession and control of the wife's estate, and her estate was subject to levy under execution for the satisfaction of his debts. The wife could not validly enter a contract or convey her own property, nor could she sue or be sued, without the joinder of her husband. *See Perry v. Stancil,* 237 N.C. 442, 75 S.E. 2d 512 (1953); *Ball v. Paquin,* 140 N.C. 83, 52 S.E. 410 (1905); 2 Lee, *supra,* at pp. 3-9; Day, Rights Accruing to a Husband Upon Marriage With Respect to the Property of the Wife, 51 Mich. L. Rev. 863-869 (1953). At one point in our history, a

---

---

husband had the right to commit a battery upon his wife so long as he did not inflict permanent injury or use excessive violence because ". . . the law permits him to use towards his wife such a degree of force as is necessary to control an unruly temper and make her behave herself. . . ." *State v. Black,* 60 N.C. 262, 263 (1864).

The presumption has come under increasing attack as society has removed from women most of the disabilities which were imposed at common law. Some states have abrogated the defense of marital coercion by statute, while others have done so by judicial decision. *See* Comment, 35 N.C.L. Rev. 104 (1956). The presumption has not been immune from criticism in North Carolina. In a concurring opinion in *State v. Seahorn, supra,* Clark, C.J., noted the change in the law since the presumption arose and concluded:

> ". . . At common law there was a presumption that when a crime was committed by the wife in the presence of her husband, she acted under compulsion; but that presumption does not comport with Twentieth Century conditions. The contention that a wife has no more intelligence or responsibility than a child is now out of date. No one believes it." 166 N.C. at 378, 81 S.E. at 689.

[3]   We believe the view taken in 1911 by Chief Justice Clark is inescapably relevant in 1977. The expansion of the cause of women's rights has so pervaded our social order that it is simply unrealistic to presume that crimes committed by a wife in the presence of her husband were executed under his dominion and control. This is not to imply that a wife may never be coerced by her husband to perpetrate an illegal act. In such case, she should remain exempt from punishment, just as would anyone who can demonstrate that the crime was committed under duress. However, we believe that when it is shown that a married woman commits a crime in the presence of her husband, she should no longer be entitled to a presumption in her favor that she was compelled to so act.

[4]   Nevertheless, regardless of our view that the presumption has long outlived its necessity and usefulness, we do not think it applicable in this case.

In *State v. Cauley, supra,* neither the feme defendant nor her husband testified. The evidence for the State clearly placed

the feme defendant present during a cruel beating of her 4-year-old son. The evidence was overwhelming as to the husband's active participation in the beating. The feme defendant was heard cursing and laughing and telling the child to walk and not go to sleep. She gave no explanation for her actions or remarks.

In *State v. Seahorn, supra,* the feme defendant did testify in her own behalf and denied participation in the crime charged. Her counsel requested the court to charge the jury that if the feme defendant made the sale of liquor as charged in the presence of her husband, and under circumstances that she was acting under his coercion, and with his consent and approval, she should be acquitted. The court refused to give the requested instruction, informing the jury that he refused to give it because the wife ". . . came upon the stand and made a statement, herself, as to her conduct and the circumstances and the things that happened on the premises. . . ." *Id.* at 376, 81 S.E. 688. The court then instructed the jury that if they found she acted voluntarily in making the liquor sales or was voluntarily assisting her husband, they would find her guilty. However, if upon a review of the evidence, they should find that she was ". . . acting under the constraint of her husband, and that he was exercising such power over her as to cause her to make sales of liquor, in his presence, so that it was not her own voluntary act, but she was the agent of her husband, then, under the circumstances, you should acquit the wife and convict the husband." *Id.*

In speaking to the contention of the feme defendant that the court erred in refusing to give the requested instruction, the Court said:

"It was entirely proper to decline to give this instruction, and if any error was committed, it was in the failure of the judge to charge that the law presumed that the wife acted under the compulsion of the husband, and the burden was upon the State to rebut this presumption.

This presumption is not a statutory presumption, but is a rule of evidence, established by the courts for the protection of married women at a time when they could not testify for themselves.

Now the *feme* defendant can testify for herself, and in this case she did, and testified that she sold no liquor at

all. She did not claim to have acted under the constraint of her husband. It would appear that if any constraining was to be done, she was the more likely to do it than the husband. We doubt, in view of all the circumstances, and her own evidence, if she was entitled to this artificial presumption, but if so, she received the benefit of it." *Id.* at 377, 81 S.E. at 688.

In *State v. Nowell, supra,* the defendant, charged with her husband with abducting a child under 14 years of age, admitted that the child did go with her but that she went on her own volition and without any persuasion or coercion. She requested an instruction with respect to her having acted under the coercion of her husband. The court instructed on the rebuttable presumption, and feme defendant assigned error to that portion of the charge. The Supreme Court, in finding no error, said that the instruction of the court was a statement of the law of which defendant had no right to complain.

In the case *sub judice,* there was no request for instructions with respect to the presumption. Here the male defendant did not testify. However, the feme defendant did so testify and stated that neither she nor her husband had anything to do with the planning of or actual accomplishment of the robbery. Her testimony was that they knew nothing about a robbery until told by Ferguson that he and Myoka had robbed Dr. Stone and that, upon being told, feme defendant's husband was furious because he and feme defendant had accompanied Ferguson and Myoka in riding back and forth by Dr. Stone's house waiting to get some pills. She further testified that her only participation was to accompany Myoka to dispose of some silver because she was afraid of Myoka and feared that she would be assaulted or implicated in the crime by Myoka if she did not do as Myoka told her. In view of the circumstances of this case, and particularly feme defendant's own testimony, we do not believe she was entitled to the presumption, regardless of whether she requested it, nor do we agree with her contention that, as to her, the case should have been dismissed because the evidence was insufficient to rebut the presumptions.

We have reviewed defendants' remaining assignments of error and find them to be without merit.

Defendants received a fair trial free from prejudicial error.

Judges PARKER and CLARK concur.